B"H

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**ARI TEMAN,**

Defendant-Appellant.

**Docket Nos. 25-332(L), 25-452(Con), 25-543(Con)**

**REPLY IN SUPPORT OF MOTION FOR RELIEF**

**TO THE HONORABLE JUDGES OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT:**

Defendant-Appellant Ari Teman, proceeding pro se, respectfully submits this reply to the government's affirmation in opposition (DktEntry: 32.1, filed April 25, 2025) by AUSA Jacob H. Gutwillig. The government's response fails to rebut the core arguments in Appellant's motion, ignores critical new evidence, and perpetuates a pattern of bias and misconduct by District Judge Paul A. Engelmayer. For the reasons below, this Court should grant Appellant's requested relief: (1) recusal of Judge Engelmayer; (2) a stay of the return orders; (3) termination of supervised release; and (4) procedural accommodations.

## I. The Government Fails to Rebut the Need for Judge Engelmayer's Recusal

The government's opposition to recusal (Opp. at 10-14) is deficient, as it ignores new evidence, misapplies legal standards, and fails to address serious allegations of bias, particularly Engelmayer's pattern of ignoring medical experts, his alleged antisemitism, his irrational and dangerous recent order, and the government's failure to address post-sentencing exculpatory evidence.

**A. The Government Ignores New Evidence of Bias Post-2023**

The government relies on the Second Circuit's 2023 summary order (United States v. Teman, 2023 WL 3882974) to dismiss Appellant's recusal claims as barred by the law of the case (Opp. at 12).

However, Appellant's motion introduces significant new developments since 2023: (1) articles of impeachment against Engelmayer filed in February 2025 (Dkt. 496 at 4; Dkt. 497 at 2); (2) public accusations of corruption by Elon Musk, Vice President J.D. Vance, and Attorney General Pamela Bondi (Dkt. 496 at 2-5); and (3) Appellant's role as someone who has already provided evidence and assistance to the Congressional office impeaching Engelmayer and his role as a potential fact witness in Engelmayer's impeachment proceedings (Mot. at 5). These developments create an objective appearance of bias under 28 U.S.C. § 455(a), as a reasonable person would question Engelmayer's impartiality when adjudicating a case involving a witness against him (In re IBM Corp., 618 F.2d 923, 929 (2d Cir. 1980)). The government's dismissal of these claims as "speculative" (Opp. at 14) is baseless, as formal impeachment proceedings backed by congressional resolutions and public campaigns are far more substantial than the "baseless suits" in United States v. Cooley, 1 F.3d 985, 993-94 (10th Cir. 1993), which the government cites.

Moreover, the law of the case doctrine only applies to issues "actually decided" (United States v. Carr, 557 F.3d 93, 101-04 (2d Cir. 2009)). The 2023 ruling addressed Engelmayer's relationship with defense counsel Noam Biale and ex parte communications, not the 2025 impeachment proceedings or Appellant's role in those proceedings. Nor did it or could it address misconduct by Biale discovered after sentencing and therefore not subject to that appeal filing—and this misconduct is serious and includes outright lying to other counsel and Teman about pursuing exculpatory evidence and speaking with witnesses when Biale did not do the things he claimed to do (see affidavit of Ronald Coleman, Exh. 6). The government's overbroad application of this doctrine is legally unsound and evades the new circumstances warranting recusal.

**B. The Government Fails to Address Engelmayer's Procedural Misconduct**

Appellant's motion alleges that Engelmayer admitted to a "regular habit of ex parte calls to aid the prosecution," resulting in a mid-case change of the prosecution team and theory, termed a "constructive amendment" by trial counsel (Mot. at 5). This serious procedural violation under United States v. Bari, 750 F.2d 1169, 1178 (2d Cir. 1984), taints the fairness of the proceedings. The government downplays this as a "brief and inconsequential" communication (Opp. at 12) but offers no explanation for how such conduct, which led to a "bait and switch" prosecution strategy, is inconsequential. This failure to engage with the substance of the allegation further demonstrates the government's refusal to confront Engelmayer's misconduct.

**C. Engelmayer's Pattern of Ignoring Medical Experts Confirms His Bias**

1

The government falsely asserts that Judge Engelmayer has been "tremendously accommodating" of Appellant's medical conditions (Opp. at 13), but the record demonstrates the opposite. Judge Engelmayer repeatedly disregarded *uncontroverted* opinions from multiple board-certified specialists, causing Appellant significant physical harm which now requires surgery to repair, and now threatens to ignore similar evidence in Appellant's pending § 2255 motion.

Newly submitted medical evidence—the Eustachian Tube Function (ETF) test conducted at Chaim Sheba Medical Center on April 3, 2025 (Exh. 2) and the letter from ENT specialist Dr. Amit Wolfovitz dated April 24, 2025 (Exh. 1)—confirms that Appellant suffers from bilateral Eustachian tube dysfunction and must avoid barometric pressure changes such as commercial flights for at least 90 days.

Judge Engelmayer's history of ignoring medical professionals is well-documented: he previously disregarded recommendations from Drs. Brusovanik, Fleishmann, Siefan, Harrison, and Budow, instead crediting non-examining BOP administrators and dismissing serious health risks.

As the letter from Dr. Brusovanik (Exh. 8) and the MRI at Akumin and ultrasound at Mount Sinai confirm that Teman was being truthful about 9-out-of-10 agony due to varioceles and degenerative disc disease. These are objective imaging tests conducted by independent, large medical establishments with no personal connection to the appellant.. The ETF test and Dr. Wolfovitz's findings now objectively validate that Appellant's prior and current medical concerns are legitimate.

Given this consistent pattern of minimizing or disregarding serious medical evidence, a reasonable observer would doubt Judge Engelmayer's ability to impartially adjudicate Appellant's § 2255 claims based on medical unfitness. Under 28 U.S.C. § 455(a), recusal is necessary to preserve public confidence in the judiciary's fairness.

- **New Medical Evidence Proves Engelmayer and the Government Are Wrong About Appellant's Ear Condition**

The government and Engelmayer assert that Appellant's medical claims are "pretextual" (Opp. at 9; Dkt. 531). However, newly submitted evidence—an Eustachian Tube Function (ETF) test from The Chaim Sheba Medical Center dated April 3, 2025 (Exh. 2), and a letter from ENT specialist Dr. Amit Wolfovitz dated April 24, 2025 (Exh. 1)—confirms that Appellant has a serious ear condition. The ETF test shows bilateral ET dysfunction (A-7, A-3 on Type A probe), indicating a significant

2

impairment. Dr. Wolfovitz's letter states that Appellant "should avoid barometric changes (for example: commercial flights, climbing to high places, HBO chamber, etc.)" and prescribes Steronase nasal spray for three months, advising against travel for 90 days due to "fear of increasing pain" (Exh. 1). This directly contradicts the government's reliance on Dr. Richard Nass's inconclusive evaluation (Opp. at 9), which was based on limited records and failed to account for the ETF test or Dr. Wolfovitz's findings.

- **Engelmayer's History of Ignoring Medical Experts**

Engelmayer's dismissal of Appellant's ear condition mirrors his prior conduct. As detailed in Appellant's motion, Engelmayer denied urgent medical care recommended by three board-certified experts—Drs. Georgiy Brusovanik, Siefan, and Harrison—leaving Appellant in 9/10 agony for months (Mot. at 9; Exh. A). Instead, Engelmayer relied on a BOP administrator with no medical degree and a doctor who never examined Appellant (Mot. at 9). Similarly, Engelmayer dismissed Dr. Maurice Budow's recommendation against air travel due to sinus issues (Dkt. 502-1), despite Dr. Budow being a licensed physician. This pattern of ignoring medical experts at great physical harm to Appellant—now evidenced by the ETF test showing actual ear dysfunction—demonstrates Engelmayer's bias and prejudice.

- **Implications for the § 2255 Motion**

This pattern directly impacts Appellant's pending § 2255 motion, which alleges he was unfit for trial based on sworn statements from Drs. Brusovanik, Siefan, and Harrison (Mot. at 8). Given Engelmayer's consistent disregard for medical experts—Drs. Budow, Brusovanik, Siefan, Harrison, and now Dr. Wolfovitz—any objective observer would conclude that Engelmayer will also ignore the medical evidence in the § 2255 motion, violating Appellant's due process rights under Drope v. Missouri, 420 U.S. 162, 171 (1975). A judge who repeatedly dismisses uncontroverted medical evidence, causing physical harm, cannot be trusted to impartially adjudicate a claim of trial unfitness based on similar evidence. Under 28 U.S.C. § 455(a), this appearance of bias mandates recusal, and Appellant must be afforded a judge who does not ignore every single medical expert.

D. The Government Ignores Engelmayer's Conflict as Appellant's Accuser

Appellant's role as someone who has already provided evidence and assistance to the Congressional office impeaching Engelmayer and his role as a potential fact witness in Engelmayer's impeachment proceedings creates an irreconcilable conflict, as Engelmayer is adjudicating a case involving his accuser (Mot. at 5). The government calls this "unsupported" and "speculative" (Opp. at 14), but this characterization is baseless. Appellant was already directed to

3

speak with Representative Eli Crane's office and did speak with them on the phone regarding abuses by Engelmayer, including the 24 rabbis who demanded Engelmayer resign for fabricating laws about Judaism and statements Appellant never said to support a conclusion that would not be possible within Jewish law, as well as Engelmayer's financial conflicts, personal conflicts, statements about faith, and other topics (Exh. 5 at 3-5). It is almost certain that Appellant will issue supporting testimony and/or other evidence against Engelmayer in Engelmayer's impeachment hearings, further exacerbating the conflict. This aligns with United States v. Microsoft Corp., 253 F.3d 34, 46 (D.C. Cir. 2001), where ex parte coordination necessitated recusal. The government's refusal to engage with this precedent or the conflict's implications further underscores the need for recusal.

### E. Engelmayer's Alleged Antisemitism and Anti-Religious Bias Mandate Recusal

The government dismisses Appellant's religious claims as pretextual (Opp. at 19), but this ignores overwhelming evidence of Appellant's sincerely held belief to reside in Israel and Engelmayer's alleged antisemitic bias, which further necessitates recusal.

- **Appellant's Deep Ties to Israel and Sincerely Held Religious Beliefs**

Appellant's religious obligation to live in Israel is well-established by two rabbinical letters: (1) Rabbi Yaakov Chikotai's affirmation (Dkt. 501-1), the Chief Rabbi of Modiin (Exh. 3); and (3) a letter from the Chief Rabbi of Israel, Rabbi Lau (Exh. 4). These authoritative sources -- who are the Appellant's religious leaders and those of the Appellant's family -- confirm the Appellant's Jewish religious belief in residing in Israel, directly refuting the government's claim that Appellant's religious arguments are a late-raised pretext (Opp. at 19).

Jewish law is unambiguous about leaving Israel being a serious violation:

> "It is forbidden to **leave** Eretz Yisrael (The Land of Israel) for the Diaspora at all times except: to study Torah; to marry; or to save one's property from the gentiles. After accomplishing these objectives, one must return to Eretz Yisrael. Similarly, one may leave Eretz Yisrael to conduct commercial enterprises. However, it is forbidden to leave with the intent of settling permanently in the Diaspora unless the famine in Eretz Yisrael is so severe that a dinar's worth of wheat is sold at two dinarim.vWhen do these conditions apply? When one possesses financial resources and food is expensive. However, if food is inexpensive, but a person cannot find financial resources or employment and has no money available, he may leave and go to any place where he can find relief. Though it is permitted to leave Eretz Yisrael under these circumstances, it is not pious behavior. Behold, Machlon and

4

> Kilyon were two of the great men of the generation and they left Eretz Yisrael only out of great distress. Nevertheless, they were found worthy of death by God."
> (Maimonides, Mishne Torah, Laws of Kings and Wars, Ch. 5)

As Teman can now conduct his business from Israel (Like many Israel-based entrepreneurs Teman only went to the USA to launch his business, and fully intended to return once it could be managed remotely, as it can be now), there is no famine, and there are many young Jewish women who might marry him, leaving Israel would be forbidden and a violation of the law.

Moreover, Appellant founded his company, GateGuard, in Israel, with its Terms drafted by Israeli law firm GKH—which employs U.S.-licensed attorneys—and reviewed by Lowenstein Sandler, a U.S. firm (Exh. 5 at 14). As Harvard Law Professor Lawrence Lessig noted, "The contract that authorized this was not crafted by Mr. Teman, but by his lawyers. They had patterned the agreement on other well-known companies (such as AirBnB)" (Exh. 5 at 7). Appellant had every intention to return to Israel to live, as evidenced by his business ties and prior travel to Israel to care for his mother (Dkt. 362).

The government's assertion that Appellant's initial travel request cited family reasons (Opp. at 19) does not negate his religious beliefs; rather, Appellant did not feel safe disclosing his full religious motivations to Engelmayer due to the judge's documented antisemitic and anti-religious statements (Exh. 5).

Furthermore, as the Supreme Court reiterated in Holt v. Hobbs, 574 U.S. 352 (2015), courts must apply strict scrutiny to any burden on religious exercise, requiring the least restrictive means. Because living in Israel is a "Mitzvah" and enables additional Jewish practices that cannot be performed outside of Israel, the least restrictive means (monitoring Zoom mental health sessions & online banking remotely, as Probation confirmed they are able to do) must be applied,.

- **Engelmayer's Antisemitism as Grounds for Recusal**

Twenty-four rabbis from across the USA and Israel, including prominent leaders from Yeshiva University, Chabad, and other institutions, have publicly accused Engelmayer of antisemitism and anti-religious bias in his treatment of Appellant, calling for his recusal and resignation (Exh. 5). In their letter filed on August 11, 2022, the rabbis state: "What we find inexcusable, and what requires your recusal from the Teman case, is the anti-Jewish - even, alas, anti-semitic - tenor of your comments towards Mr. Teman. You claimed that drafting accounts on the Friday before Passover is a sign of intent to defraud, when the first two days of Passover that year fell on Saturday and

5

Sunday, days which banks are officially closed. Such a claim constitutes an abuse of the Jewish faith for dishonest, misleading purposes" (Exh. 5 at 3). They further note that Engelmayer "invented statements by Mr. Teman that he had intentionally chosen to use the Passover weekend to defraud his clients - statements for which there is not a shred of evidence in the record" (Exh. 5 at 3). The rabbis also condemn Engelmayer for requiring Appellant and an observant witness to remain in court into the Sabbath, violating Jewish law (Exh. 5 at 4-5).

When twenty-four religious leaders—spanning two countries—denounce a judge as an antisemite who abuses Judaism to convict a defendant, a reasonable observer would question his impartiality in a case involving a Jewish defendant asserting religious rights (Liteky v. United States, 510 U.S. 540, 548 (1994)). This widespread rabbinical condemnation, combined with Engelmayer's failure to address Appellant's free exercise claims, constitutes independent grounds for recusal under 28 U.S.C. § 455(a). (Unfortunately, the concept of a "self-hating Jew", for example, kapos who assisted the Nazis, is not rare, and Paul Englemayer openly brags in court about not respecting Jewish law and drags other Jews into court on Jewish holidays and the Sabbath so as the 24 Rabbis stated, his actions speak for themselves.)

- **Appellant's Increased Religiosity in Prison**

The government's claim that Appellant's religious arguments are pretextual also fails to account for the fact that Appellant became even more religious during his imprisonment. While in prison, Appellant read extensively, studying the Talmud, Tanach, and other Jewish writings, and also wrote extensively on Jewish topics, which deepened his commitment to his faith and its "Mitzvah" of living in Israel. Appellant was also Torah reader for the Jewish services. Following imprisonment, Appellant continued to learn, meet with Rabbis, organize Shabbat meals, and pursue other religious activities. Appellant is a regular in synagogue in Tel Aviv and hosts regular Shabbat meals. This evolution in faith does not undermine the sincerity of his beliefs; rather, it reinforces the authenticity of his religious obligation to remain in Israel, as affirmed by the Chief Rabbis of Modiin and Israel, Rabbi Lau (Exhs. 3, 4).

**F. The Government Ignores Post-Sentencing and Post-Appeal Exculpatory Evidence**

The government entirely ignores allegations of new evidence discovered after sentencing and the 2023 appeal, which the Second Circuit never considered. This evidence reveals misconduct by defense counsel Noam Biale and undermines the government's case, further supporting recusal and reversal.

6

- **Biale's Misconduct**

Appellant has uncovered evidence that Noam Biale lied to Appellant and others, including attorney Ronald Coleman, about pursuing exculpatory evidence during trial (Mot. at 5; Exh. 6). In his affidavit, Coleman confirms that in November 2020, Sher Tremonte lawyers (including Biale) claimed they had or intended to contact shareholders at 18 Mercer Street to obtain documents regarding a board member's improper conduct in connection with GateGuard—a person who later testified for the government (Exh. 6 at 2).

However, Biale did not follow through, despite his assurances, prejudicing Appellant's defense. This misconduct, discovered post-sentencing, was not addressed by the Second Circuit in 2023 and constitutes a violation of Appellant's right to effective counsel under Strickland v. Washington, 466 U.S. 668, 694 (1984).

The government's failure to engage with this new allegation—combined with Engelmayer's close personal ties to Biale and his wife, AUSA Margaret Graham (Exh. 5 at 5)—creates an appearance of bias, as Engelmayer is unlikely to impartially adjudicate claims against his friend.

- **Exculpatory Evidence from Shelly Pecot**

Post-sentencing evidence from Shelly Pecot, a shareholder at 18 Mercer, directly contradicts the government's trial narrative (Exh. 5 at 9-10). Pecot confirms that Appellant warned her and other shareholders of GateGuard's terms, including: (1) an $18,000 fee for device removal; (2) a $10,000 collections fee; (3) attorney fees; (4) binding arbitration; and (5) the right to draft owed monies from their bank account (Exh. 5 at 9).

This aligns with testimony from two other entities who acknowledged the terms (Exh. 5 at 14), as well as Ronald Coleman's letter noting that GateGuard's terms were legally enforceable and modeled on Airbnb's (Exh. 5 at 12-14).

Additionally, Pecot reveals that witness Bonnie Soon-Osberger was told by her board members that she was "legally liable" for the fees Appellant warned them about and later drafted, and that witness Gina Hom was copied on these emails, contradicting Hom's testimony that Mercer was unaware of the contract and fees (Exh. 5 at 9). Hom's false testimony, combined with the government's failure to correct it, violated Appellant's due process rights under Napue v. Illinois, 360 U.S. 264, 269 (1959).

7

The government's refusal to address this new evidence, which undermines the conviction and was not considered by the Second Circuit, further supports recusal. Engelmayer's bias—evidenced by his ex parte calls to aid the prosecution (Exh. 5 at 3) and his failure to disclose his $2 million interest in Bank of America (Exh. 5 at 4)—suggests he will not impartially consider this evidence on remand, necessitating a new judge.

Moreover, because Biale, Engelmayer's close personal friend, failed to pursue this evidence and lied about pursuing it, it is clear and obvious that Engelmayer is ignoring the evidence to protect Biale—and at the very least, the question of whether evidence which Engelmayer's mentee lied about pursuing is material or exculpatory should be heard by a judge who is not Biale's mentor and close family friend.

**G. Engelmayer's Irrational "Travel by Boat" Order Demonstrates His Animosity and Inability to Judge Fairly**

Judge Engelmayer's April 17, 2025 order suggesting that Appellant travel "by boat" if unable to fly (Dkt. 531) further underscores an objective appearance of bias.

- First, the order is factually unrealistic. There are no regular passenger boat services from Israel to the United States. Any such journey would require extensive overland travel through multiple countries, exposing Appellant to heightened risks during a period of active conflict in the region.

- Second, the order disregards Appellant's substantiated medical condition. Dr. Wolfovitz explicitly advised against travel involving barometric pressure changes for 90 days due to significant ear dysfunction (Exh. 1). The government's own independent expert, Dr. Nass, could not definitively conclude that air travel was safe.

- Third, by proposing an irrational and dangerous alternative without basis in medical or logistical reality, Judge Engelmayer departs from the standards of judicial reasonableness, thereby reinforcing the objective appearance of personal animosity toward Appellant.

    Fourth, with a felony conviction on his record (which this court should overturn, just as the nation's top law professors on all sides of the political spectrum *and the current US Attorney for DC Edward Martin* and the head of DOJ Civil Rights Harmeet Dhillon and her firm's partner Ronald Coleman have all argued (Exh. 9., Exh 10.)), such travel would require extensive legal work and applications in multiple jurisdictions to be allowed to travel.

8

- Finally, the "travel by boat" condition imposes an unreasonable burden in violation of 18 U.S.C. § 3583(d), which mandates that supervised release conditions be no more restrictive than necessary to achieve supervision goals.

These factors, individually and collectively, would cause a reasonable observer to question Judge Engelmayer's impartiality, necessitating recusal under 28 U.S.C. § 455(a).

## II. The Government Fails to Rebut the Need for a Stay of the Return Orders

The government argues that Appellant's request for a stay fails the four-factor test under Nken v. Holder, 556 U.S. 418, 433-34 (2009) (Opp. at 15-22). However, its analysis is flawed, as it underestimates Appellant's likelihood of success, minimizes irreparable harms, and overstates the government's interest.

**A. Likelihood of Success**

The government claims Appellant has "no likelihood of success" (Opp. at 16), but this ignores multiple grounds for reversal:

- **Unaddressed Religious Rights**:
The District Court failed to analyze Appellant's free exercise claims, supported by rabbinical affirmations (Dkt. 501-1; Exhs. 3, 4), across multiple orders (Mot. at 8). The government dismisses this as pretextual (Opp. at 19) but does not explain why the Court's silence is lawful. Precedent requires courts to address such claims or concede them by default (Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); United States v. Hamilton, 699 F.2d 232, 235 (5th Cir. 1983)). This alone warrants reversal.

- **Engelmayer's Bias**:
As detailed above, Engelmayer's bias—evidenced by impeachment proceedings, his conflict as Appellant's accuser, ex parte communications, ignoring medical experts, alleged antisemitism, failure to address new exculpatory evidence, and his irrational "travel by boat" order—renders the orders suspect. The government's reliance on the law of the case (Opp. at 16) is misplaced, as new evidence post-2023 justifies revisiting recusal.

Law of the case applies only to facts and arguments previously decided. Here, impeachment proceedings, Teman's call with Representative Eli Crane's office, the newly uncovered affidavit of Ronald Coleman and other evidence of Biale's failures and lies, and accusations from 24 rabbis arose after the time period covered by the prior appeal, making law of the case inapplicable (United States v. Carr, 557 F.3d 93, 101-04 (2d Cir. 2009)).

- **Strong § 2255 Motion and New Evidence**:
The § 2255 motion, supported by uncontroverted medical evidence of trial unfitness (Mot. at 8), has a strong chance of success under Strickland v. Washington, 466 U.S. 668, 694 (1984).

9

Additionally, the new evidence of Biale's misconduct (Exh. 6) and Pecot's testimony (supra § I.F) strengthens Appellant's appeal, as it shows a lack of criminal intent and prosecutorial misconduct, which the Second Circuit never considered.

- **Unlawful "Travel by Boat" Order**:
Engelmayer's April 17, 2025, order directing Appellant to travel by boat if air travel remains contraindicated (Dkt. 531) is unlawful and irrational, as there are no boats from Israel to the USA, and the journey would be dangerous during wartime (supra § I.G). This order violates 18 U.S.C. § 3583(d) by imposing an undue burden and demonstrates Engelmayer's inability to issue reasoned decisions, further supporting reversal.

## B. Irreparable Harm

The government reduces Appellant's harms to "inconvenience and travel costs" (Opp. at 20), ignoring well-documented irreparable injuries:

- **Religious Rights**:
Forcing Appellant's return violates his First Amendment right to reside in Israel, a sincerely held belief affirmed by Rabbi Yaakov Chikotai (Dkt. 501-1), the Chief Rabbi of Modiin (Exh. 3), and the Chief Rabbi of Israel, Rabbi Lau (Exh. 4). Appellant's deep ties to Israel—founding GateGuard there with legal support from GKH and Lowenstein Sandler (Exh. 5 at 14)—further underscore this obligation. Such violations constitute irreparable harm (Elrod v. Burns, 427 U.S. 347, 373 (1976)).

- **Medical Harm and Dangerous Travel Order**:
 The ETF test and Dr. Wolfovitz's letter confirm that air travel risks permanent ear damage (Exhs. 1, 2). The government's reliance on Dr. Nass's inconclusive evaluation (Opp. at 9) is inadequate, as it ignores the ETF test and Dr. Wolfovitz's 90-day no-fly recommendation.

  Moreover, Engelmayer's "travel by boat" order (Dkt. 531) exposes Appellant to grave physical harm, as there are no boats from Israel to the USA, and the journey would require travel through conflict zones during wartime (supra § I.G). This reckless directive risks Appellant's safety and constitutes irreparable harm.

- **Sunflower Centers and Associational Rights**:
The return orders delay the Sunflower Centers project, harming thousands of trauma survivors, and sever Appellant's ties with elderly parents and coreligionists (Mot. at 12). These disruptions to protected associational rights under Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984), are irreparable.

## C. Harm to the Government and Public Interest

The government claims a stay undermines public safety and judicial integrity (Opp. at 21), but this is unsubstantiated. Engelmayer himself stated Appellant is not a flight risk or danger (Mot. at 2), and remote supervision via Zoom is viable, as initially recommended by Probation (Dkt. 483; United States v. Johnson, 529 F.3d 493, 498 (2d Cir. 2008)).

10

The government provides no evidence that in-person supervision is necessary, nor does it address Appellant's full compliance since 2019. Conversely, the public interest favors a stay to uphold judicial integrity amid Engelmayer's impeachment, alleged antisemitism (by 24 independent, ordained rabbis!), and irrational orders, and to enable the Sunflower Centers to aid trauma victims (Mot. at 6).

## III. Supervised Release Must Be Terminated Due to Vindictive Punishment

The government argues there is no basis to terminate supervised release (Opp. at 22-23), but this ignores the vindictive and excessive nature of the return orders.

The orders, timed after Appellant's impeachment advocacy and his warning by email that Mr. Guttwillig could face disciplinary actions by the new DOJ (which has, in fact, terminated multiple members of his team or pushed them to resign), serve no rehabilitative purpose and instead punish Appellant by separating him from family and delaying the Sunflower Centers (Mot. at 9).

The "travel by boat" order (Dkt. 531) further exemplifies this vindictiveness, imposing an undue burden that violates 18 U.S.C. § 3583(d) (supra § I.G.3). This violates United States v. Murray, 692 F.2d 149, 152 (D.C. Cir. 1982), which prohibits vindictive conditions. Additionally, Engelmayer's denial of medical care, causing excessive suffering (Mot. at 9; supra § I.C), violates the Eighth Amendment (Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

The government fails to address these claims, and its reliance on outdated sentencing remarks (Opp. at 18) cannot justify continued supervision when remote monitoring suffices.

## IV. The Government's Attacks on Appellant's Credibility Are Baseless

The government accuses Appellant of "demonstrably false and self-serving statements," citing an alleged attempt to fabricate juror misconduct (Opp. at 7). This is a gross mischaracterization.

### A. Appellant Was Truthful About Juror Misconduct

Juror Chris Urriola lied about not knowing Appellant in order to join the jury. In fact, email evidence *which Appellant provided to trial counsel at night during trial* (Exh. 7), proves that Urriola requested to connect with Appellant on LinkedIn on December 2, 2018, at 5:52 PM, and his LinkedIn profile at the time listed him as "Owner at VMSNYC, LLC," a compliance monitoring and assistance

11

company in direct competition with Appellant's GateGuard/PropertyPanel service, which offers compliance monitoring for free. Removing Appellant's ability to conduct business would restore the value of Urriola's services, creating a clear conflict of interest.

Trial counsel had a legal responsibility to alert the court immediately during trial, especially after Appellant warned them via email on January 24, 2020, at 4:57 AM (Exh. 7), and noted to them that Urriola had shot him dirty looks while whispering to other jurors -- which is why Teman searched his email at and social media at night to see if this individual knew him and why he would be making such faces.

Therefore, the ludicrous allegation that Appellant suggested an anonymous FBI report is obviously unfounded, false, and completely nonsensical, as Appellant had already alerted counsel via email (Exh. 7), and counsel *during trial* had a legal and ethical responsibility to immediately alert the judge and government and demand a hearing with the jury to see what this juror had been whispering to them, but failed to do so—likely because Appellant had no funds to pay them due to prolonged illness and mental health hospitalizations, and they wanted to avoid more work or a retrial.

This clear bias should have disqualified Urriola, and his false statements during jury selection and his dirty looks and whispers to fellow jurors violated Appellant's right to an impartial jury and should have been reported immediately by trial counsel upon receipt of the email proving Uriola had been connected to Teman on LinkedIn, at Urriola's request, and was his direct business competitor. The government and trial counsel failed in their ethical duties to investigate Urriola's lies and the impact he had during the week he was with the jury during meals, travel, and breaks, despite Appellant raising this issue and they now try to deflect from their legal and ethical failure with complete fabrication.

Furthermore, even were a defendant to suggest an anonymous report to the FBI about a juror's misconduct, this would not be evidence of dishonesty. The FBI regularly advertises for anonymous crime reporting, and such a report would have been truthful. In fact, the Appellant has now reported Urriola to the FBI (but not anonymously as there would be no reason to do so) The government's attempt to portray Appellant as dishonest is a distraction from its own failure to ensure a fair trial. This court -- if it is at all concerned with fairness at trial -- should please order and independent judge to question all jurors under oath on the record as to what Urriola said to them during breaks.

12

.

**B. Appellant's Medical Claims Are Supported by Evidence confirmed by Board-certified Doctors**

As detailed above (supra § I.C), the ETF test and Dr. Wolfovitz's letter confirm the legitimacy of Appellant's ear condition, directly refuting the government's and Engelmayer's claims of pretext. Similarly, Dr. Brusovanik and imagery taken by Mount Sinai and by Akumin confirm that Appellant was being truthful about physical conditions causing 9-out-of-10 agony while at FCI Miami and that Engelmayer disregarded three board-certified physicians' recommendations at great harm to the Appellant and without any independent board-certified expert contradicting their recommendations.

This further undermines the government's attacks on Appellant's credibility and highlights Engelmayer's bias in dismissing medical evidence.

# V. Probation's Retaliatory Change in Recommendation Violates Appellant's First Amendment Rights

The Probation department initially recommended that Appellant be allowed to remain in Israel, a position they emphatically supported (Dkt. 483). However, following Appellant's email to AUSA Gutwillig on, in which Appellant stated that Gutwillig might face disciplinary action by the new Trump DOJ for assisting witnesses in hiding exculpatory emails and text messages (Dkt. 295), Probation reversed its recommendation and now supports Appellant's return to the United States. This change is purely retaliatory and intended to have a "chilling effect" on Appellant's First Amendment rights to free speech and to negotiate and prosecute his defense.

It is standard practice in litigation for parties to threaten sanctions or disciplinary action for discovery violations, such as the alleged hiding of exculpatory evidence. Such communications are protected speech under the First Amendment, as they are integral to a defendant's right to defend himself (see United States v. Alvarez, 567 U.S. 709, 717-18 (2012) (recognizing First Amendment protection for speech related to legal proceedings)). By changing its recommendation in direct response to Appellant's email, Probation retaliated against Appellant for exercising his constitutional rights, intending to deter him from further pursuing his defense or raising legitimate concerns about prosecutorial misconduct. This retaliation violates Appellant's First Amendment rights by chilling his ability to advocate for himself (see Hartman v. Moore, 547 U.S. 250, 256 (2006) (retaliatory actions by government officials in response to protected speech violate the First Amendment)).

13

Moreover, the court's order requiring Appellant to return to the United States, contrary to Probation's initial recommendation, constitutes a civil rights violation actionable outside this case. In Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019), the Supreme Court held that retaliatory actions by government officials that infringe on First Amendment rights give rise to a cause of action under 42 U.S.C. § 1983. Here, Probation's retaliatory change in recommendation, followed by the court's order to return, directly resulted from Appellant's protected speech and imposes a significant burden on his religious and associational rights (supra § II.B). This violation of Appellant's civil rights provides an independent basis for relief in this motion and supports a separate § 1983 claim against the responsible officials.

## Conclusion

The government's opposition is deficient: it ignores new evidence of Engelmayer's bias, including his alleged antisemitism (Exh. 5), his irrational "travel by boat" order (Dkt. 531), fails to rebut constitutional and procedural errors, and minimizes irreparable harms while overstating its own interest.
Engelmayer's pattern of ignoring medical experts—evidenced by the ETF test, Dr. Wolfovitz's letter, and prior denials of care—caused Appellant physical harm and suggests he will similarly disregard the § 2255 motion's medical evidence, necessitating recusal. His "travel by boat" order is dangerous, unlawful, and reflects personal animosity, further mandating recusal.

Appellant's religious obligation to live in Israel, affirmed by Rabbi Chikotai, the Chief Rabbi of Modiin, and the Chief Rabbi of Israel, Rabbi Lau (Dkt. 501-1; Exhs. 3, 4), is well-established, and Engelmayer's failure to address this right, combined with his alleged anti-religious bias, supports recusal.

The government's failure to address post-sentencing exculpatory evidence from Shelly Pecot (Exh. 5 at 9-10) and Biale's misconduct discovered after the first appeal period (Exh. 6) undermines the conviction and supports reversal.

The government's attacks on Appellant's credibility are baseless, as email evidence proves (Exh. 7) Appellant was truthful about juror misconduct, just as Dr. Wolfovitz and Dr. Brusovanik confirmed he was truthful about his medical conditions.

14

In addition to all of these reasons, the Chief Rabbi Lau, makes an important point: Mercy. There is no compelling reason to disrupt the Appellant's life and tear him from his elderly parents, especially his mother who is facing serious medical challenges and surgeries and cannot travel to the USA. The purpose of probation is to ensure a defendant is able to return to society and rebuild his life, to become a contributing member of society and of his family. Tearing the appellant away from his family and his people and his volunteer work is counter to the aims of probation. It does not help with mental health, it does not help with physical health, and it does not give the defendant the necessary stability, family support, and access to affordable medical care and surgery he needs to fully recover and reintegrate. Therapy is by zoom, and banking is online -- Probation has already confirmed they can monitor these remotely --  so you should allow me to rebuild my life with my family and loved ones near me here in Israel. Please. Please be merciful and leave me and my elderly parents and family alone to rebuild our lives after this long case and imprisonment.

This Court should grant Appellant's motion in full: recuse Engelmayer, stay or vacate the return orders, and  terminate supervised release or move the Appellant to remotely reporting supervision.

**Request for Published Ruling**

Given the current political climate and accusations of judicial corruption against Judge Engelmayer by the President, Vice President, and Attorney General, as well as elected members of Congress, Appellant respectfully requests that this Court issue a published ruling on this motion, rather than an unpublished or summary ruling. The issues presented—judicial bias, alleged antisemitism by a federal judge, violations of religious and medical rights, and the propriety of conditions of supervised release—raise matters of significant public interest and legal importance, particularly given Engelmayer's impeachment proceedings and the involvement of twenty-four rabbis who have publicly condemned his  conduct and sought his resignation (Exh. 5). A published ruling will provide necessary transparency, ensure accountability in the judiciary, and offer guidance for future cases involving similar allegations of judicial misconduct, thereby serving the interests of justice and the public. This is all the more important in the context of Judge Engelmayer admitting he regularly has ex parte meetings and calls with other judges and the Government without the presence of defense counsel (Dkt No. 321-1, Dkt _).

Respectfully submitted,
/s/ Ari Teman
Ari Teman, Pro Se
ari@teman.com
April 28, 2025 / 30th of Nisan, 5785, Tel Aviv, Israel

15

**CERTIFICATE OF SERVICE**

I certify that on April 26, 2025, a true copy of this reply was served via email on:

- Jay Clayton, U.S. Attorney, SDNY (via ECF via Temp Pro Se Email)
- Jacob H. Gutwillig, AUSA (via ECF via Temp Pro Se Email)
- Harmeet K. Dhillon (DOJ Civil Rights) (via ECF via Temp Pro Se Email and via email - [Harmeet.Dhillon@USDOJ.gov](mailto:Harmeet.Dhillon@USDOJ.gov) )
- U.S. Probation Office, S.D.F.L. (via email - [Jimmy_wong@flsp.uscourts.gov](mailto:Jimmy_wong@flsp.uscourts.gov) )

**/s/ Ari Teman**

Ari Teman, Pro Se

April 28, 2025 / 30th of Nisan, 5785

Tel Aviv, Israel

16

**Attachments:**

- Exh. 1: Letter from Dr. Amit Wolfovitz (April 24, 2025)
- Exh. 2: Eustachian Tube Function (ETF) Test from The Chaim Sheba Medical Center (April 3, 2025)
- Exh. 3: Letter from the Chief Rabbi of Modiin
- Exh. 4: Letter from the Chief Rabbi of Israel, Rabbi Lau
- Exh. 5: Letter from Rabbi Leibel Khazanovich and 23 Other Rabbis (filed Aug. 11, 2022, Dkt. 326)
- Exh. 6: Affidavit of Ronald D. Coleman (filed Apr. 16, 2023, Dkt. 350-1)
- Exh. 7: Email from Ari Teman to Trial Counsel Regarding Juror Chris Urriola (Jan. 24, 2020)
- Exh. 8: Letter from Dr. Brusovanik decrying Engelmayer's repeated ignoring of medical experts and imagery and outlining how it harmed Teman

17